**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------X

CHRISTINA W. DONNELLY, JOHN
DONNELLY, JAMES G. WILLIAMSON, and
RICHARD W. DEARBORN, Individually and
On Behalf of All Others Similarly Situated,

                 Plaintiffs,

      vs.

XYBERNAUT CORPORATION, EDWARD
G. NEWMAN, STEVEN A. NEWMAN,
THOMAS D. DAVIS, BRUCE C. HAYDEN,
and GRANT THORNTON LLP,

               Defendants.

-------------------------------------------------------X

Case No.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

**JURY TRIAL DEMANDED**

# PART 2 of 2

In light of Grant Thornton LLP's resignation as the Company's independent auditor and the other matters discussed above, the Company is unable to predict when new auditors will be selected and its Form 10-K will be filed.

67.     On April 25, 2005, Xybernaut announced that the United States Attorney's Office for the Eastern District of Virginia had commenced an investigation of the Company relating to the wrongdoing discovered in it internal investigation. In addition, Xybernaut stated that "it continues to face a severe liquidity crisis and possible insolvency" and that it may not have sufficient cash to meet its financial obligations or fund continuing operations. To address these concerns, the Company announced the formation of the Office of the Chairman of the Board consisting of three co-chairmen. In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--April 25, 2005-- Xybernaut® Corporation (NASDAQ:XYBRE - News) today announced that William Tuttle and two other outside directors, Harry E. Soyster and Marc Ginsberg, will serve as co-chairmen in a newly created Office of the Chairman of the Board. Although the three co-chairmen will act as directors and not as management, they will provide counsel and be a resource to senior management.
>
> On April 23, 2005, Tuttle formally resigned as the Company's Interim Chairman and Chief Executive Officer and joined Soyster and Ginsberg in forming the newly created Office of Chairman of the Board. Tuttle's resignation was based upon his concerns about his ability to satisfy unilaterally the significant time commitments required to effectively address the needs of shareholders and employees. Tuttle also stated that he remains committed to continued participation in the effort to determine the best way forward for the Company, working along with Soyster and Ginsberg.
>
> The Company also announced that the Company was contacted Friday, April 22 by the U. S. Attorney's Office for The Eastern District of Virginia, which is opening an investigation. In addition, the Audit Committee, through its legal counsel, has contacted the Securities and Exchange Commission in connection with the previously disclosed Audit Committee investigation and findings. The Company will cooperate fully in these investigations and any others.

The Company also affirmed that it continues to face a severe liquidity crisis and possible insolvency. There can be no assurances that the Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

## UNDISCLOSED ADVERSE INFORMATION

68.    The market for Xybernaut's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Xybernaut's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least April 8, 2005. Plaintiff and other members of the Class purchased or otherwise acquired Xybernaut securities relying upon the integrity of the market price of Xybernaut's securities and market information relating to Xybernaut, and have been damaged thereby.

69.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Xybernaut's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

70.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Xybernaut's business, prospects and operations. These

material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Xybernaut and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

71.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme alleged herein. In addition, defendants were motivated to engage in the fraudulent scheme to complete at least $25.85 million in private placements of Company stock and warrants, and long-term borrowings.

## DEFENDANTS' FINANCIAL STATEMENTS
## DURING THE CLASS PERIOD WERE
## MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

72.    At all relevant times during the Class Period, defendants represented that Xybernaut's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Xybernaut's stock, defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity and earnings during the Class Period.

73.    Xybernaut's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Xybernaut's actual operating results. Specifically, as discussed herein, defendants caused the Company to violate GAAP by (1) improperly accounting for revenue related to certain product sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and properly account for related party transactions in accordance with GAAP and SEC rules.

74.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations

34

about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

75.    As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-0l(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> ...financial statements are management's responsibility... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

### Xybernaut's Improper Failure To Disclose Material Related Party Transactions

76.    In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57, *Related Party Disclosures* (March 1982), GAAP provides guidance on disclosures of transactions between related parties.[1] SFAS No. 57 states that an "enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable." Accordingly, SFAS No. 57 requires that financial statements **identify material related party transactions and disclose (a) the "nature of the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount of transactions for each period for which an income statement is presented," and (d) the**

---

[1] Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions.

**"[a]mounts due from or to the related parties as of the date of each balance sheet**.

(Emphasis added.)[2]

77.    In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

[I]n some cases, the significance of an amount may be independent of the amount involved. For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small (Emphasis added.)

78.    As Xybernaut has now admitted, before and during the Class Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following (during the Class Period):

a.    Defendant Edward Newman's improper use of substantial Company finds for personal expenses and failure to properly substantiate expenses charged to the Company; and

b.    Major transactions entered into by certain members of senior management in violation Company internal controls and their failure to properly advise the Board of Directors of material financial conditions regarding the transactions.

79.    Moreover, GAAP, in APB Opinion No. 22, *Disclosure of Accounting Policies*, ¶ 7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. Id ¶ 8. Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides, in part:

---

[2] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:

a.     A selection from existing acceptable alternatives;

b.     Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;

c.     Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

80.     Xybernaut's Class Period financial statements were thus also false and misleading and failed to comply with GAAP because they failed to disclose and identify the improper accounting of revenue related to certain product sales. Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Xybernaut's financial reporting.

81.     Xybernaut's failures violated a number of additional GAAP provisions. For example, GAAP provides that:

a.     "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions" (CON No. 1, ¶ 34);

b.     "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources" (CON No. 1, ¶ 40);

c.     "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general" (CON No. 1, ¶ 50);

d. "[f]inancial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance" (CON No. 1, ¶ 42);

e. financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶ 58-59);

f. financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶ 79); and,

g. financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶ 95, 97).

### Failure to Maintain an Adequate System of Internal Controls

82. In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which rendered Xybernaut's financial reporting inherently corrupt, subject to manipulation and unreliable, resulting in materially false and misleading financial statements.

83. In this regard, the defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing defendants to improperly report revenue related to the sale of certain products, and to engage in improper related party transactions.

84. Section 13 (b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and

(B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

85.    Xybernaut violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its reporting of revenue related to certain product sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses. Accordingly, Xybernaut violated Section 13(b)(2)(A) of the Exchange Act.

86.    In addition, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Xybernaut failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties. It failed to ensure that transactions were reported in accordance with its own policies and with GAAP. Accordingly, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act.

87.    Xybernaut's lack of adequate internal controls rendered Xybernaut's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## DEFENDANT GRANT THORNTON LLP
## PARTICIPATION IN THE FRAUD AND ITS SCIENTER

88.    Defendant Grant Thornton is a worldwide firm of certified public accountants, auditors, and consultants. Grant Thornton's website states that "[t]hrough member firms in 110 countries, including 49 offices in the United States, the partners of Grant Thornton member firms provide personalized attention and the highest quality service to public and private clients around the globe." Through its Vienna, Virginia office, Grant Thornton served as Xybernaut's auditor and principal accounting firm since fiscal 2000. Grant Thornton was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS")[3], and to report the audit results to Xybernaut, the board of directors, the audit committee, and the members of the investing public, including Plaintiffs and other members of the Class. With knowledge of Xybernaut's true financial condition, or in reckless disregard thereof, Grant Thornton certified the materially false and misleading financial statements of Xybernaut, described below and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements. Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

### Grant Thornton Had Full and Complete Access to Xybernaut's Information

89.    Grant Thornton, by virtue of its of its relationship with Xybernaut and the nature of the auditing and consulting services rendered to the Company, and the fact that Grant Thornton's personnel were regularly present at Xybernaut and had intimate knowledge of

---

[3] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA") relate to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU §___) are recognized by the AICPA as the interpretation of GAAS.

Xybernaut's financial reporting practices based on its access to confidential internal corporate, financial, operating and business information, Grant Thornton knew of or recklessly disregarded the adverse facts alleged herein concerning the Company's improper financial reporting during the Class Period, including the Company's fiscal 2002 and 2003 year-end financial statements and Grant Thornton's unqualified audit opinions thereon. Nonetheless, Grant Thornton knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

### Grant Thornton Failed to Render an Accurate Audit Report

90.     Grant Thornton violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. AU § 508.04. Grant Thornton's opinion falsely represented that Xybernaut's fiscal 2002 and 2003 financial statements were presented in conformity with GAAP when they were not for the myriad reasons herein alleged.

91.     The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work. The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS. AU § 508.07.

92.     Grant Thornton did not render an accurate audit report and thus did not exercise due professional care, because Xybernaut's financial statements were not in conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to audit Xybernaut's financial statements as of December 31, 2002 and 2003, in accordance with GAAS.

93.     Grant Thornton issued its audit opinion, dated February 13, 2003, except for Notes 3 and 14, as to which the date is March 26, 2003, on Xybernaut's fiscal 2002 financial statements. Grant Thornton's opinion stated that such Xybernaut financial statements were

41

presented in conformity with GAAP and that Grant Thornton's audit was performed in

accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2002 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

94.     Grant Thornton issued its audit opinion, dated February 19, 2004, on

Xybernaut's fiscal 2003 financial statements, which it stated were presented in conformity with

GAAP and that Grant Thornton's audit was performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a

test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

95.    In issuing such audit opinions, Grant Thornton turned a blind eye to Xybernaut's improper accounting practices, as described above, and issued unqualified audit opinions on Xybernaut's fiscal 2002 and 2003 financial statements, even though Grant Thornton knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Xybernaut and its subsidiaries as of December 31, 2002 and 2003, and the results of their operations and cash flow for the years ended December 31, 2002 and 2003; and (b) Grant Thornton had not audited Xybernaut's fiscal 2002 and 2003 financial statements in accordance with GAAS. As set forth in detail herein, Xybernaut's violations of GAAP during the Class Period include, among other things:

- the improper reporting of revenue relating to certain product sales;

- improper accounting of related party transactions entered into by members of the Company's senior management; and

- improper accounting of reimbursement of Company expenses.

### Grant Thornton Failed to Obtain Sufficient Competent Evidential Matter

96.    During the course of Grant Thornton's audits of Xybernaut, there appeared "red flags" which should have raised questions in the auditors' minds and led them to

procure additional evidential matter. In conducting an audit, an auditor must obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

97.    For example, during the Class Period, Grant Thornton knew or recklessly disregarded the following "red flags":

a.    The Xybernaut Defendants' willingness and desire of the Company's Chairman and CEO, Edward G. Newman, to improperly use substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.

b.    Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.

c.    The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.

d.    There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.

e.    Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

98.    The foregoing "red flags" provided notice to Grant Thornton about Xybernaut management's character and lack of integrity. Management's lack of integrity should, in turn, have caused Grant Thornton to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. See AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified

as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

99.    Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that Grant Thornton failed to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's Forms 10-K during the Class Period relating to the disclosures regarding earnings, as evidenced by the "lack of adherence to effective disclosure controls governing the Company's public disclosures ." See AU § 550.

### Grant Thornton Failed to Exercise Due Professional Care

100.    Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

101.    Grant Thornton did not exercise due professional care because it failed to: obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

102.    Grant Thornton violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Grant Thornton knew or recklessly disregarded that Xybernaut's disclosures were not reasonably adequate.

103.    For example, Grant Thornton ignored the fact that Xybernaut failed to make adequate disclosures concerning accounting policies relating to the recognition of revenue

on the sales of certain products. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. APB Opinion No. 22 ¶ 7. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. Id ¶ 8. Accordingly, GAAP, in APB Opinion No. 22 ¶ 12, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a.      A selection from existing acceptable alternatives;
>
> b.      Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c.      Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

104.    Accordingly, because Xybernaut "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [and Grant Thornton] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

105.    Grant Thornton violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

106.    Grant Thornton violated GAAS General Standard No.2 that requires that

46

independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

107.    Grant Thornton violated SAS No. 82 in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Xybernaut during the Class period, which adversely affected Xybernaut's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to:

> • *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

> • *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

> • *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

> • *New technology.* Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

> • *New business models, products, or activities.* Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

> • *Corporate restructurings.* Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

> • *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

108.    Grant Thornton violated GAAS and the standards set forth in SAS No. 1

and SAS No. 53 by, among other things, failing to adequately plan its audit and properly

supervise the work of assistants and to establish and carry out procedures reasonably designed to

search for and detect the existence of errors and irregularities that would have a material effect

upon the financial statements.

109.    Grant Thornton violated GAAS and the standards set forth in SAS No. 8,

by failing to take appropriate action relating to material misstatements of fact contained in the

MD&A section of Xybernaut's fiscal 2002 and 2003 Forms 10-K relating to the disclosures

regarding the recognition of revenue recognition related to certain product sales.

110.    Grant Thornton violated GAAS Standard of Field Work No. 2, which

requires the auditor to make a proper study of existing internal controls, including accounting,

financial and managerial controls, to determine whether reliance thereon was justified, and if

such controls are not reliable, to expand the nature and scope of the auditing procedures to be

applied. The standard provides that a sufficient understanding of an entity's internal control

structure be obtained to adequately plan the audit and to determine the nature, timing and extent

of tests to be performed. AU § 150.02. In all audits, the auditor should perform procedures to

obtain a sufficient understanding of three elements of an entity's internal control structure: the

control environment, the accounting system, and control procedures. AU § 319.02.

111. As a result of its failure to accurately report on Xybernaut's fiscal 2002 and

2003 financial statements, Grant Thornton utterly failed in its role as an auditor as defined by the

SEC. SEC Accounting Series Release No. 296, *Relationships Between Registrants and*

*Independent Accountants*, Securities Act Release No. 6341, Exchange Act Release No. 18044,

states in part:

> Moreover, the capital formation process depends in large part on the confidence
> of investors in financial reporting. An investor's willingness to commit his capital

48

to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

112.    Grant Thornton's opinions, which represented that Xybernaut's fiscal 2002 and 2003 year end financial statements were presented in conformity with GAAP, were materially false and misleading because Grant Thornton knew or was reckless in not knowing that Xybernaut's fiscal 2002 and 2003 year end financial statements violated the principles of fair reporting and GAAP. In the course of rendering its unqualified audit certification on Xybernaut's fiscal 2002 and 2003 year end financial statements, Grant Thornton knew it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. Grant Thornton, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

113.    Grant Thornton knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Xybernaut's fiscal 2002 and 2003 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

114.    Accordingly, Grant Thornton ignored the guidance under Section 10A of the Securities and Exchange Act which requires the auditor to design procedures "to identify

related party transactions that are material to the financial statements or otherwise require disclosure therein..." In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SPAS 57, in the financial statements. See AU § 334.11.

115.    Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" and that is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process, summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

116.    Grant Thornton failed to consider whether additional audit testing was required for related party transactions; it also regularly failed to undertake some of the basic audit procedures in connection with related party transactions. AU § 334.08. Moreover, once an auditor has identified related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. AU § 334.09. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. AU § 334.09.

117.    According to SAB No. 99, "quantitative benchmarks for assessing materiality (e.g., a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5
### PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

118.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.    During the Class Period, Xybernaut and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xybernaut's securities; and (iii) cause Plaintiffs and other members of the Class to purchase Xybernaut's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

120.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Xybernaut's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

121.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the

51

integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R.
Sections 210.01 et seq.) and Regulation S-K(17 C.F.R. Sections 229.10 et seq.) and other SEC
regulations, including accurate and truthful information with respect to the Company's
operations, financial condition and earnings so that the market price of the Company's securities
would be based on truthful, complete and accurate information.

122.    Xybernaut and the Individual Defendants, individually and in concert,
directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of
the mails, engaged and participated in a continuous course of conduct to conceal adverse
material information about the business, operations and future prospects of Xybernaut as
specified herein.

123.    These defendants employed devices, schemes and artifices to defraud,
while in possession of material adverse non-public information and engaged in acts, practices,
and a course of conduct as alleged herein in an effort to assure investors of Xybernaut's value
and performance and continued substantial growth, which included the making of, or the
participation in the making of, untrue statements of material facts and omitting to state material
facts necessary in order to make the statements made about Xybernaut and its business
operations and future prospects in the light of the circumstances under which they were made,
not misleading, as set forth more particularly herein, and engaged in transactions, practices and a
course of business which operated as a fraud and deceit upon the purchasers of Xybernaut's
securities during the Class Period.

124.    Each of the Individual Defendants' primary liability, and controlling
person liability, arises from the following facts: (i) the Individual Defendants were high-level
executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Xybernaut's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Xybernaut's securities was artificially inflated during the Class Period. In ignorance of the fact

that market prices of Xybernaut's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Xybernaut securities during the Class Period at artificially high prices and were damaged thereby.

127.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Xybernaut, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Xybernaut securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

128.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### VIOLATION OF SECTION 20(a) OF
### THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

130.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

131.    The Individual Defendants acted as controlling persons of Xybernaut within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

133.    As set forth above, Xybernaut and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.     Determining that this action is a proper class action and appointing the Plaintiffs as Lead Plaintiff and their counsel as Lead Counsel for the Class and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 26, 2005

Respectfully submitted,

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**

By: /s/ Seth D. Rigrodsky
Seth D. Rigrodsky (#3147)
Ralph N. Sianni (#4151)
Brian D. Long (#4347)
919 N. Market Street, Suite 411
Wilmington, DE 19801
Telephone: (302) 984-0597
Facsimile: (302) 984-0870

--and--

**MILBERG WEISS BERSHAD
& SCHULMAN LLP**
Steven G. Schulman
David P. Brower
Peter E. Seidman
Sharon M. Lee
One Pennsylvania Plaza — 49th Floor
New York, N.Y. 10119-0165
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

**HOLMAN LAW OFFICE**
Thomas A. Holman (TAH-2094)
One Pennsylvania Plaza — Suite 4632
New York, N.Y. 10119
Telephone: (212) 699-4596
Facsimile: (212) 947-9967

**Plaintiffs' Counsel**

Certification of Plaintiffs Under the Federal Securities Laws

Christina W. and John Donnelly ("Plaintiffs") hereby state:

1.  We have reviewed the Class Action Complaint in this action and we authorize the filing of that Class Action Complaint on our behalf.

2.  We did not purchase the security that is the subject of the complaint at the direction of our attorneys, or in order to participate in any private action arising under the federal securities laws.

3.  We are willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The following includes all of our transactions in Xybernaut Corporation common stock/securities during the class period specified in the complaint:

| Security | Transaction | Trade Date | Price Per Securities/Share | Quantity |
|---|---|---|---|---|
| XYBR | Purchase | 6/21/2002 | $0.90 | 500 |
| XYBR | Purchase | 6/21/2002 | $0.91 | 500 |
| XYBR | Purchase | 6/21/2002 | $0.90 | 1,000.00 |
| XYBR | Purchase | 11/7/2002 | $0.56 | 4,200.00 |
| XYBR | Purchase | 11/7/2002 | $0.57 | 4,800.00 |
| XYBR | Purchase | 11/11/2002 | $0.56 | 5,000.00 |
| XYBR | Purchase | 11/25/2002 | $0.70 | 2,000.00 |
| XYBR | Purchase | 12/5/2002 | $0.68 | 1,000.00 |
| XYBR | Purchase | 12/23/2002 | $0.52 | 3,000.00 |
| XYBR | Purchase | 12/23/2002 | $0.52 | 3,000.00 |
| XYBR | Purchase | 4/16/2003 | $0.42 | 3,500.00 |
| XYBR | Purchase | 11/14/2003 | $1.96 | 2,000.00 |
| XYBR | Purchase | 2/19/2004 | $1.79 | 2,000.00 |
| XYBR | Purchase | 4/13/2004 | $1.38 | 500 |
| XYBR | Purchase | 8/4/2004 | $1.31 | 800 |
| XYBR | Purchase | 10/27/2004 | $1.22 | 1,000.00 |
| XYBR | Purchase | 11/4/2004 | $1.22 | 2,000.00 |
| XYBR | Purchase | 2/16/2005 | $0.91 | 500 |
| XYBR | Purchase | 2/16/2005 | $0.94 | 500 |
| XYBR | Purchase | 2/28/2005 | $0.83 | 1,500.00 |
| XYBR | Purchase | 3/17/2005 | $0.61 | 1,000.00 |

5.  In the past three years, we have not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  We will not accept any payment for serving as a representative party on behalf of the class beyond plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses

(including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

We declare under penalty of perjury that the foregoing is true and correct

Executed this 20th day of May, 2005.

Christina W. Donnelly

John Donnelly

### Certification of Plaintiff Under the Federal Securities Laws

James G. Williamson ("Plaintiff") hereby states:

1.    I have reviewed the Class Action Complaint in this action and I authorize the filing of that Class Action Complaint on my behalf.

2.    I did not purchase the security that is the subject of the complaint at the direction of my attorneys, or in order to participate in any private action arising under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The following includes all of my transactions in Xybernaut Corporation common stock/securities during the class period specified in the complaint:

| Security | Transaction | Trade Date | Price Per Securities/Share | Quantity |
|---|---|---|---|---|
| XYBR | Purchase | 6/11/2002 | $ 0.93 | 1,000 |
| XYBR | Purchase | 11/25/2002 | $ 0.68 | 3,000 |
| XYBR | Purchase | 7/26/2004 | $ 1.49 | 5,000 |

5.    In the past three years, I have not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 20th day of May, 2005.

James G. Williamson

## Certification of Plaintiff Under the Federal Securities Laws

RICHARD W. DEARBORN ("Plaintiff") hereby states:

1.  I have reviewed the Class Action Complaint in this action and I authorize the filing of that Class Action Complaint on my behalf.

2.  I did not purchase the security that is the subject of the complaint at the direction of my attorneys, or in order to participate in any private action arising under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.  The following includes all of my transactions in Xybernaut Corporation common stock/securities during the class period specified in the complaint:

| Security | Transaction | Trade Date | Price Per Securities/Share | Quantity |
|----------|-------------|------------|----------------------------|----------|
| XYBR | Purchase | 11/20/2003 | $ 1.79 | 5,000 |

5.  In the past three years, I have not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct

Executed this 24th day of May, 2005.

RICHARD W. DEARBORN